# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JAMES R. RANDALL, RONALD J.
ROMERO, STANLEY HUTCHINSON,
RANELL A. GARCIA, ALBERT V.
VOGEL, SARAH C. McMAHON, MARK C.
LEACHMAN, JUDITH L. LOVDOKKEN,
and KENNETH R. KYLER,

       Plaintiffs,                                   Civ. No. 00-349 MV/RHS

vs.

GALE NORTON, Secretary of the Interior,
and JOSEPH F. ALSTON, Superintendent,
Grand Canyon National Park,

       Defendants,
and

GRAND CANYON RIVER OUTFITTERS
ASSOCIATION,

       Intervener.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' Complaint for Judicial Review of

Administrative Action **[Doc. No. 1]**, filed March 10, 2000, and Motion for Expedited Hearing and

Interim Relief **[Doc. No. 41]**, filed March 1, 2002. The Court, having considered the

administrative record, briefs, relevant law, and being otherwise fully informed, finds that Plaintiffs'

Motion for Expedited Hearing and Interim Relief should be **DENIED**. The Court further finds

that relief as requested in Plaintiffs' Complaint for Judicial review will be **DENIED in part and**

**GRANTED in part.**

## BACKGROUND

The National Park Service (NPS) is charged with regulating the federal national parks system, 16 U.S.C. § 1, and the Secretary of the Interior is required to create rules and regulations governing parks use and management under conditions she "may deem necessary and proper," 16 U.S.C. § 3. Included in this delegation of power is the authority to manage the Colorado River corridor in the Grand Canyon. 16 U.S.C. § 1a-2(h). Following a dramatic increase in use of the River corridor in the 1960s and early 1970s, the NPS began issuing permits to commercial outfitters to provide guided boat trips to the public. Traffic continued to increase, and concern over the detrimental impact of such use led the NPS to promulgate regulations over boating in the River corridor. 36 C.F.R. § 7.4.

In 1976, the NPS began developing a document for managing the River corridor and, in 1979, produced a Colorado River Management Plan (CRMP) that was accompanied by an Environmental Impact Statement (EIS), as required under the National Environmental Policy Act (NEPA). (Admin. R. Doc. No. 113-5.) The 1979 CRMP introduced the concept of "user days"[1] and an allocation system that divides a fixed maximum number of user day permits between two groups, commercial users (i.e., professionally outfitted river runners) and noncommercial users (i.e., self-outfitted river runners). The 1979 CRMP was followed by several other management plans, each preceded by some form of agency evaluation and review that involved various mechanisms for public participation. Notably, every one of these management plans used the same numerical allocation as had been set forth in the 1979 CRMP. (Admin R. Doc. Nos. 73-28, 99-12, 99-14, 156-10.)

The last management plan to emerge from such a procedure was adopted in 1989. Preparation for review of the 1989 CRMP began in 1991, with the creation of the Colorado River

---

[1] One user day equals any day that is used in whole or in part by an individual or party.

Constituency Panel to serve in an advisory capacity and make recommendations to the NPS regarding the management plan.  (Admin. R. Doc. No. 165.)  Official review of the 1989 CRMP commenced in 1997, with release of the final draft CRMP slated for January 2000.  (Admin. R. Doc. No. 180-4.)  However, the review process continued past the contemplated deadline and, in February 2000, was suspended.  On February 22, 2000, the Superintendent of the Grand Canyon National Park circulated a memorandum explaining that because of the inability to resolve various contentious issues – including disputes over the asymmetrical user day allocation between commercial and noncommercial boaters – and the lack of financial and personnel resources to complete a comprehensive planning effort, work on the CRMP was being terminated.  (Admin. R. Doc. No. 260-5 to -6.)  The Superintendent noted that, in light of the suspension, the 1989 CRMP would remain one of the "guiding documents" for management of the River corridor. (Admin. R. Doc. No. 260-5 to -6.)  As such, the use allocations outlined in the 1989 CRMP, which reflect the same figures set forth in 1979, remain in effect today.

Plaintiffs are individuals on the waiting list for noncommercial boaters seeking use permits for the River corridor.  On March 9, 2000, Plaintiffs filed a Complaint for Judicial Review of Administrative Action **[Doc. No. 1]** seeking declaratory and injunctive relief against the Secretary of the Interior and the Superintendent of Grand Canyon National Park (Park).  Plaintiffs allege that the rules and regulations governing the allocation of use between commercial and noncommercial boaters are arbitrary and capricious.  Additionally, Plaintiffs argue that both the actual allocation and method of determining allocation of river use between commercial and noncommercial users, constitute an abuse of discretion; violate Park plans and procedures, and the NPS Organic Act, 16 U.S.C. §§ 1a-2 and 3; and Plaintiffs' due process rights.

On May 18, 2000, third party Grand Canyon River Outfitters Association (GCROA) filed a Motion to Intervene as Defendant **[Doc. No. 11 & 12]**, which the Court granted **[Doc. No. 16]**. Plaintiffs subsequently filed a Brief in Support of Petition for Judicial Review **[Doc. No. 27]**, to which both Defendants and Intervener filed response briefs. Plaintiffs filed a Reply on January 11, 2001 **[Doc No. 35]**.

On February 1, 2002, Defendants Gale Norton and Joseph Alston moved to dismiss Plaintiffs' Complaint as moot. This Court held a hearing on June 11, 2003, at which time the parties also addressed whether the relevant statute of limitations on Plaintiffs' claims had run. On August 19, 2003, the Court entered an Amended Memorandum Opinion and Order **[Doc. No. 54]** denying Defendants' motion to dismiss and finding that Plaintiffs' claims were not time-barred.

On August 28, 2003, Magistrate Judge Robert H. Scott requested clarification from the parties about the precise nature of Plaintiffs' claims. Plaintiffs responded via letter on September 22, 2003, followed by Defendants and Intervener.

## DISCUSSION

### A.      Claims under § 706(2)(A) of the Administrative Procedures Act

In Count I of their Complaint, Plaintiffs allege "that the regulations concerning allocation of use are arbitrary and capricious; that the actions of defendants in failing and refusing to adjust or modify the allocations in a fair and equitable manner for a period of over twenty-one years is arbitrary, capricious, and an abuse of discretion." (Compl. ¶33.) While Plaintiffs use the term "regulations," based on their reply brief and their clarifications to Magistrate Judge Scott, it appears they are not challenging the regulations at 36 C.F.R. § 7.4(b), but are contesting the actual numerical allocation of user days. As a remedy, Plaintiffs ask for a declaration that the allocation is "inequitable as a matter of law" and an injunction compelling Defendants to adjust

the allocation in a "fair and equitable" manner, "within a reasonable time not to exceed sixty days." (Compl. ¶33.)

In Count V, Plaintiffs allege that the "use of separate definitions of primary season for commercial and noncommercial users is arbitrary, capricious, and an abuse of discretion," in that the difference allows commercial users to "concentrate their use during the optimum summer months." (Compl. ¶¶47, 48.) Consequently, Plaintiffs request an "immediate judgment that noncommercial users receive their full allocation of use during the primary or summer season and that the 'primary' or summer season be defined the same for both commercial and noncommercial users." (Compl. ¶50.)

### 1. Jurisdiction

As a preliminary matter, the APA does not give the Court authority to demand that the NPS reallocate user permits in a fair and equitable manner or alter its definitions of "primary season," even if the Court finds the agency in violation of the APA. In relevant part, the APA states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Plaintiffs have provided no legal or factual argument on how their prayer for relief might fall into one of these "exceptional circumstances," and the Court finds no reason for concluding that the injunctive relief sought comes within this exception to the rule.

Furthermore, to the extent Plaintiffs claim in Counts I and V that the allocation creates an unequal distribution of use permits or that Defendants have failed to allocate permits in a "fair and equitable" manner, the claims are not actionable under the APA and therefore must be dismissed. In conducting judicial review under § 706(2)(A), "the agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonable based on that consideration." *Mt. Evans Co. v. Madigan*, 14 F.3d 1444, 1453 (10th Cir. 1994). Plaintiffs' accusation that the current allocation and the use of different "primary seasons" are unfair and inequitable posits a disagreement with the outcome of the administrative process. In the absence of any statutory or legal requirement that the allocation be evenly distributed between commercial and noncommercial users, the Court's review of administrative action on that issue is far more limited. The Court may not substitute its judgment of what the actual allocation ought to be for the determination made by the agency, *e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[2]

However, Plaintiffs' remaining claim in Count I that Defendants have "ignored evidence" of the increase in demand for noncommercial use (Compl. ¶29), does fall within the scope of review authorized by the APA. *E.g., id.* at 43 (stating that "arbitrary and capricious" review under APA involves examining whether agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

---

[2]Plaintiffs also seek in Count VI an injunction preventing Defendants from renewing or entering into contracts with commercial river outfitters until the allocation has been adjusted in a "fair and equitable" manner. As that request for relief is premised on the existence of some right to a "fair and equitable" allocation, it too must be dismissed.

agency expertise"); *see also* discussion *infra* Part A.2. This claim may only be heard by the Court, however, if the allocation decision is itself or is part of some "final agency action."

### a. "Finality" requirement

Section 704 of the APA restricts judicial review to "final agency action for which there is no other adequate remedy in a court," including any "preliminary, procedural, or intermediate agency action or ruling not directly reviewable" otherwise. 5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (stating that when judicial review is sought "under the general review provisions of the APA, the 'agency action' in question must be 'final agency action'"). Thus, in the instant suit, jurisdiction exists only if the adoption of the management plan containing the allocation is subject to judicial review.

As stated earlier, when the NPS ceased its CRMP review process in February 2000, it left the 1989 CRMP as the guiding document for management of the River corridor. (Admin. R. Doc. No. 260-5 to -6.) The 1989 CRMP used the same numerical allocation set forth in the 1981 CRMP (Admin. R. Doc. No. 156-10), and the 1981 CRMP in turn had reincorporated the allocations derived initially in the 1979 CRMP (Admin. R. Doc. No. 100-2). Thus, the agency's rationale behind the current permit allocation between commercial and noncommercial users is to be discerned by looking at the rationale offered in 2000 for terminating the review process and for adopting the 1989 CRMP, as well as the reasons underlying the 1979 allocation.

However, before proceeding to this analysis on the merits, the Court must first decide whether in fact the termination decision was "final" for purposes of the APA. As a general matter, "[t]o determine when an agency action is final, [the Supreme Court has] looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on ... day-to-day business.'" *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992) (quoting *Abbott*

*Labs. v. Gardner*, 387 U.S. 136, 152 (1967), *overturned on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). The Supreme Court has identified two conditions that typically must be satisfied to meet this finality requirement. "First, the action must mark the 'consummation' of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Intervener disputes whether the first of these requirements has been met.

In a press release dated February 23, 2000, the NPS announced its decision to terminate the review process, explaining as follows:

> Due to the inability to resolve many ... issues [including user day allocation between commercial and noncommercial users] prior to the resolution of the park's wilderness recommendation [by Congress], and to the lack of available fiscal and human resources to complete a comprehensive planning effort, the NPS will halt work on any further combined planing effort [to couple the Colorado Management Plan with the Park's Backcountry Management Plan] and on the Colorado River Management Plan. Further effort to merge the two planning efforts into an EIS will be deferred until such a time as congress [sic] formally acts upon the wilderness recommendation and/or until the NPS has both the financial and human resources to complete planning and NEPA compliance. The current Backcountry Management Plan approved in 1988 and Colorado River Management Plan approved in 1989 will continue to be the guiding documents for management.

(Admin. R. Doc. No. 262-1 to -2.) In the press release, then-Superintendent Robert Arnberger was quoted as saying that, in the interim, the NPS would continue to seek certain "improvements," including the issue of user allocation:

> Although the NPS will defer major changes in the allocation of river use between the commercial and private sectors until revision of the Colorado River Management Plan can be carried out, it will examine the possibility of reallocation of user days at the contract renewal stage in three years, and other possible administrative actions.

(Admin. R. Doc. No. 262-2.)

In light of this caveat, Intervener contends the February 2000 termination decision is only temporary in nature and that, according to the NPS's own statements, review "in all likelihood might be restarted sometime in the near future." (Intervener's Resp. at 20.) In effect, Intervener places singular emphasis on the NPS's indication that it will review the possibility of reallocation in the coming months or years as indicative of the on-going nature of the review process. However, this narrow analytical approach ignores the fact that "cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (quoting *Abbott Labs.*, 387 U.S. at 149); *see also, Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003); *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F.Supp.2d 1249, 1252 (D.N.M. 2003). While the NPS apparently will revisit the allocation dispute at some future time, there is no doubt that the planning process that surrounded review of the 1989 CRMP has officially ended. First, as Intervener itself concedes, the relevant finality inquiry is whether the decision to terminate *review of the 1989 CRMP* was "final agency action." That one discrete part of the CRMP will be reexamined henceforth does not mean that the entire CRMP is still open to review or that the decision to end review of the entire CRMP was not a "final" act. Whatever the status of the allocation issue may be, the decision to stop review of the CRMP is in no practical sense "temporary." The NPS has made clear that it has consummated the decisionmaking and evaluation process that had begun in 1997; that is, it is not taking a temporary hiatus in operations. Indeed, the nature of the termination decision here parallel those found to support a finding of "finality" in *Bennett*: in both instances, the agency decision was not made by a lower-

ranking administrative officer and was clearly a binding determination, not "advisory" action. *Bennett*, 520 U.S. at 177-78.

### b. "Ripeness" requirement

Intervener further argues that, should the Court should find the NPS's February 2000 termination decision to be final, Plaintiffs' claims are not ripe for review under the APA. The purpose of the ripeness requirement is "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Labs.*, 387 U.S. at 148-49). "Thus, before a court may review an agency decision, it must evaluate 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 243 (10th Cir. 1991) (quoting *Abbott Labs.*, 387 U.S. at 149). The Tenth Circuit has focused on the following factors in making this evaluation:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff[;] and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*Gordon v. Norton*, 322 F.3d 1213, 1219 (10th Cir. 2003) (quoting *Ash Creek*, 934 F.2d at 243). "The first two factors address the fitness of the issues for judicial decision; the second two address the hardship to the parties of withholding review." *Northwest Pipeline Corp. v. F.E.R.C.*, 986 F.2d 1330, 1334 (10th Cir. 1993). No single factor is "either necessary or sufficient to establish the ripeness of the issue for review," and the proper approach is to balance each one in light of the facts presented. *Id.*

Although Plaintiffs' claim - that Defendants have "ignored evidence" of the increase in demand for noncommercial use in setting forth the existing allocation system - is not purely legal, the remaining factors weigh in favor of a finding of ripeness. Review of Plaintiffs' claim requires consideration of the February 2000 termination decision, which the Court previously determined was final agency action. *See* discussion *supra* Part A.1.a. To reiterate, the readoption of the 1989 CRMP is conduct "by which 'rights or obligations have been determined, or from which legal consequences will flow,'" *Colo. Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173-74 (10th Cir. 2000) (quoting *Bennett*, 520 U.S. at 178), since all future decisions concerning the River corridor will be made within the parameters of that plan. Furthermore, the third factor is met for precisely this reason: Plaintiffs' personal ability to raft the river is directly impacted by the termination decision since the allocation system set forth in the 1989 CRMP determines whether and how they might obtain use permits.

In applying the fourth factor, the Court's primary concern is that "'the agency should be given the first chance to ... apply [its] expertise.'" *CSG Exploration Co. v. F.E.R.C.*, 930 F.2d 1477, 1486 (10th Cir. 1991) (quoting *McKart v. United States*, 395 U.S. 185, 194 (1969)). Here, the agency has had an opportunity to review data related to the allocation issue; the question is whether the agency has failed to consider significant information in making its decision. The NPS stated that one of the reasons for terminating the review process was the inability to reach a resolution on the allocation dispute. While the Court is not authorized under the APA to make that decision, it may consider whether the NPS has overlooked salient data during its decisionmaking process. *E.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In this manner, consideration of the issue by the Court may further effective administration by the NPS, as required by the final requirement for a finding of ripeness.

## 2. "Arbitrary and Capricious" review

Having established jurisdiction, the Court now must determine whether the NPS's decision was "arbitrary and capricious." Judicial review under this standard is narrow. *Id.* In evaluating agency action, a court must "consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). As stated in *Motor Vehicle*, agency action will be found "arbitrary and capricious" in situations where

> the agency ... relied on factors which Congress has not intended it to consider, *entirely failed to consider an important aspect* of the problem, offered an *explanation for its decision that runs counter to the evidence* before the agency, or is so *implausible* that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle,* 463 U.S. at 43 (emphasis added). While courts are not permitted to "'supply a reasoned basis for the agency's action that the agency itself has not given,'" they must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

Plaintiffs' claims that Defendants have "ignored evidence of a dramatic increase in demand for non-commercial use over the past twenty one years" in adopting the current allocation (Compl. ¶29), and that the current allocation is entirely lacking in factual support, (Pls.' Reply at 10) are belied by the record. In an internal document outlining Superintendent Arnberger's analysis of various issues related to River corridor management, user day allocation was described as "the most problematic of all the issues to solve." (Admin. R. Doc. No. 263-10.) Arnberger continued, "The NPS has gathered much information on possible improvements to the allocation system. However, none of them come free of inherent systemic problems common to all systems

that must deal with one inescapable reality: 'Demand exceeds supply.'" (Admin. R. Doc. No. 263-10.) In a letter sent by NPS officials to an individual inquiring about the allocation system and concerned about noncommercial user access to the River, Arnberger stated that the NPS "recognizes that the demand for access by *all* members of the public (those who desire self-outfitted trips, and those who desire commercially-outfitted river trips) has increased since the last [CRMP] revision." (Admin. R. Doc. No. 254-38 (emphasis added).) Arnberger further stated that "[s]ince 1989, the number of [noncommercial] waiting list members has nearly doubled, considering a 10 percent annual average increase." (Admin. R. Doc. No. 254-38.) Contrary to Plaintiffs' contentions, the administrative record clearly indicates that NPS had not ignored and was keenly aware of evidence of the increased demand for noncommercial use since 1979.

As for their claim that the allocation is baseless, Plaintiffs explain that the current allocation is ultimately an adoption of the 1979 CRMP allocation, which they allege was only a "best guess." (Pls.' Reply at 10.) Plaintiffs take this latter term out of context in suggesting it means the allocation was created arbitrarily and without any rational basis. The 1979 CRMP states that "[t]he allocation between commercial and noncommercial use outlined [here] is based on the *best available information* on the demand for commercial and noncommercial trips." (Admin. R. Doc. No. 73-28 (emphasis added).) The plan noted that the figures reflecting actual commercial and noncommercial use were imprecise because record-keeping on how many parties used or attempted to use the River corridor was not perfect.[3] Accordingly, the plan

---

[3]Specifically, the 1979 CRMP stated:

Figures on potential passengers turned away by commercial concessioners may count individuals more than once as they are turned away by successive companies. When certain dates are full, some companies issue brochures indicating this fact. There is no way to count potential passengers turned away in this manner. Figures on the demand for noncommercial trips are complicated by duplicate applications, false

acknowledged that "[t]he allocation is, because of the above factors, a *best estimate* based on experience and on interpretation of the available data." (Admin. R. Doc. No. 73-28 (emphasis added).)  In other words, the phrase "best estimate" refers to numbers based on actual use, not unfounded hypotheticals about user demand.  As Plaintiffs have not offered any evidence that would contradict the evidentiary grounds for these estimates or that would otherwise render the agency's decisionmaking suspect under APA standards, Plaintiffs' claim that the allocation devised in 1979 was not based on any facts is plainly controverted by the record.

Moreover, demand is not the only factor considered in determining the appropriate allocation.  As Defendants have argued extensively, the NPS's mandate in managing the River corridor and national parks generally is a broad one.  Under the NPS Organic Act, the agency's duty with regard to national park management is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.  In furtherance of this purpose, the Organic Act provides that the Secretary of the Interior "shall make and publish such rules and regulations as [s]he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service."  16 U.S.C. § 3.  Through the Organic Act, Congress "expressly delegate[d] rulemaking authority to the Secretary of the Interior to promulgate rules and regulations to implement the Act."  *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1451 (9th Cir. 1996).  The Secretary's power to administer the Grand Canyon River corridor is part of this delegation.  16 U.S.C. § 1a-2(h).  In fulfilling its mandate the

---

applications, failure of interested but discouraged river runners to apply, etc.

(Admin. R. Doc. No. 73-28.)

NPS is entitled to look at a wide range of factors in devising management plans, of which demand for noncommercial use is only one consideration:

> [T]he Organic Act is silent as to how the protection of park resources and their administration are to be effected. Under such circumstances, the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate. Further, the Park Service is empowered with the authority to determine what uses of park resources are proper and what proportion of the park's resources are available for such use.

*Nat'l Wildlife Fed'n v. Nat'l Park Serv.,* 669 F.Supp. 384, 391 (D. Wyo. 1987) (citations omitted). Thus, as the Ninth Circuit stated in a case involving a similar dispute between commercial and noncommercial users at the inception of the CRMP process, no one party's demand for access to the river automatically trumps that of the other:

> The Service recognizes its obligation to protect the interests of both classes of users. It can hardly be faulted for doing so. If the over-all use of the river must, for the river's protection, be limited, and if the rights of all are to be recognized, then the "free access" of any user must be limited to the extent necessary to accommodate the access rights of others.

*Wilderness Pub. Rights Fund v. Kleppe*, 608 F.2d 1250, 1253 (9th Cir. 1979). While the lack of any change in the numerical allocations for over twenty years understandably raises questions about the review and management process, this does not mean the NPS has turned a blind eye to the issue. Under the APA, the Court is only to determine whether the NPS considered "relevant factors" in making its decision regarding review of the 1989 CRMP and allocation of use and "whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. The administrative record presently before the Court demonstrates that the NPS, in reaching its decision to terminate the review of the 1989 CRMP and re-adopt the previous user day allocations, weighed a number of appropriate factors. Accordingly, the Court finds no clear error in the decision to terminate the review process or in the allocation itself.

## B.  Claims under § 706(1) of the Administrative Procedures Act

In Count IV, Plaintiffs claim that Defendants' failure and refusal to review the most recent data on demand for noncommercial use, to adjust the user day allocation in light of the increased demand, and to conduct a comprehensive review of the 1989 CRMP before the end of 1999 each constitute action unlawfully withheld or unreasonably delayed. Though nowhere cited, Plaintiffs presumably are invoking § 706(1) of the APA, which states that a "reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). However, courts may only compel action where the agency failed to perform a mandatory, nondiscretionary duty. *E.g., Ctr. for Biological Diversity v. Veneman*, 335 F.3d 849, 854 (9th Cir. 2003); *S. Utah Wilderness Alliance v. Norton (SUWA)*, 301 F.3d 1217, 1226 (10th Cir. 2002), *cert. granted*, 72 U.S.L.W. 3307 (U.S. Nov. 03, 2003) (No. 03-101); *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

As for the first of Plaintiffs' charges, even if the Court were to assume that the NPS is under a mandatory duty to review statistics, the claim must fail because the agency did consider the increase in demand from noncommercial users when it elected to cease the review process. *See* discussion *supra* Part A.2. Plaintiffs' allegations about the NPS's failure and refusal to adjust the allocation also must fail because the NPS is under no obligation to adjust these numbers, no matter what the demand for use is.

As for Plaintiffs' claim concerning NPS's failure to complete a comprehensive plan review by the end of 1999, the inquiry into whether the NPS had a mandatory, nondiscretionary duty to take such action is guided by the Tenth Circuit's ruling in *SUWA*. In that case, the Bureau of Land Management (BLM) argued it did not have a mandatory duty to carry out various study and review activities contained in Land Use Plans (LUPs) that the BLM itself had promulgated. The Tenth Circuit squarely rejected this position, explaining as follows:

The Factory Butte and San Rafael LUPs declare that Factory Butte "*will be monitored*" for [off-road vehicle or ORV] use and that an ORV implementation plan for San Rafael "*will be* developed." The [Federal Land Policy and Management Act], in turn, unequivocally states that "[t]he Secretary shall manage the public lands ... in accordance with the land use plans developed by him." 43 U.S.C. § 1732(a); *see also Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1299 (10th Cir. 1999) (noting how the BLM "shall manage" lands in accordance with LUPs); *Natural Res. Def. Council, Inc. v. Hodel*, 618 F.Supp. 848, 858 (E.D. Cal. 1985) (same). Relevant regulations similarly provide that the BLM "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans." 43 C.F.R. § 1601.0-5(c). Therefore, a straightforward reading of the relevant LUPs, as well as applicable statutes and regulations, suggests that the BLM must carry out specific activities promised in LUPs.

*SUWA*, 201 F.3d at 1234 (emphasis added). The case at bar differs from the facts of *SUWA* in that no statute or agency regulation requires the NPS to create any type of "management plan" for the River corridor, let alone demands that the agency comply with its own plans. However, the 1989 CRMP contains language mirroring that of the *SUWA* LUPs. A section titled "Plan Review and Update" states, "The Colorado River Management Plan will be in effect for a five to ten year period. A comprehensive plan review, directed by the Superintendent through the Division of Visitor and Resources Protection and the Division of Resources Management and Planning, *will occur before the end of this period*." (Admin. R. Doc. No. 156-15 (emphasis added).) In light of this language, the Court finds the differences between the facts of this case and those of *SUWA* insufficient to make the latter inapplicable. Accordingly, the Court finds that the language of the 1989 CRMP imposed on the NPS a mandatory duty, as is required for review under the APA's "unlawfully withheld or unreasonably delayed" provision.

Turning to the merits of this claim, the Court first must determine whether the agency's failure to complete review as scheduled constitutes action "unlawfully withheld" or "unreasonably delayed." The distinction is significant because substantive review under § 706(1) differs depending on how the agency's conduct is characterized:

> [I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions -- such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," *see* 5 U.S.C. § 555(b) -- a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act.

*Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).

In the case at bar, the 1989 CRMP set an absolute deadline for completion of the comprehensive review since reappraisal of the plan was to be completed by the end of 1999 at the latest. Therefore, under the Tenth Circuit's analysis in *Forest Guardians*, this claim is properly understood as a complaint about action "unlawfully withheld" and the Court has no choice but to must compel the NPS to act. *See id.* at 1192 ("Congress through 5 U.S.C. § 706, has explicitly removed from the courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions.") In their response briefs, Defendants emphasize that the review process was halted partly because of limited financial and personnel resources, and the NPS's consideration of competing priorities in light of these constraints. (Defs.' Resp. at 33; Admin. R. Doc. No. 264-1 to -2.) However, the Tenth Circuit has made explicit that even if an agency claims inadequate resources, "[i]n the face of Congress' clear command [in 5 U.S.C. § 706], the [agency's] inadequate resource argument must fail with respect to the appropriate remedy." *Id.* at 1191-93.

As has been stated often, "compelling agency action is distinct from ordering a particular outcome." *SUWA*, 301 F.3d at 1226. Here, the Court is only directing the NPS to complete a comprehensive plan review, as had been contemplated by the 1989 CRMP, within a reasonable time. This does not mean that the NPS is required to change the user day allocations; rather, the NPS is only required to abide by its mandatory, nondiscretionary duty to complete a reevaluation of the 1989 CRMP.

## C. Count II

In Count II, Plaintiffs allege that the "granting of privileges and permits to commercial users while failing and refusing to regulate allocation of use in a fair and equitable manner interferes with [their] free access to the natural curiosities and wonders of the Park in violation of 16 U.S.C. § 3." (Compl. ¶34.) In so doing, Plaintiffs assume the Organic Act creates a statutory right of "free access" through its statement that "[n]o natural, [sic] curiosities, wonders, or objects of interest shall be leased, rented, or granted to anyone on such terms as to interfere with free access to them by the public." 16 U.S.C. § 3. However, as other courts have noted, the Organic Act does not provide for judicial review on its own or otherwise create any private right of action. *E.g., Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997) (noting NPS Organic Act contains no provision establishing judicial review or creating private cause of action); *City of Sausalito v. O'Neill*, 211 F.Supp.2d 1175, 1186-87 (N.D. Cal. 2002) (noting existence of no private right of action under NPS Organic Act). As these courts have explained, judicial review of agency action for violation of the Organic Act is available only through the APA.[4]

---

[4]Although at least one federal court has stated in dicta that a cause of action may lie under § 1 of the Organic Act, Plaintiffs' Complaint cannot be read as stating a claim under that provision. In *Sierra Club v. Babbitt*, 69 F.Supp.2d 1202, 1247 (E.D.Cal. 1999), the district court held that a party might state an actionable claim if it alleged that the NPS had permitted "use of a national park in a way that was not in the interests of either conservation or public enjoyment or in a way that was clearly against the interests of future generations." By contrast, Plaintiffs' claim in Count II rests on the "free access" language of § 3, not any guarantees arguably made in § 1.

Moreover, the substance of the claim presently before the Court exceeds the scope of judicial review that even the *Sierra Club* decision found to exist under 16 U.S.C. § 1:

The Organic Act itself does not mandate that the balance in any particular decision reflect one value over the other. For that reason, the Organic Act does not serve as basis for a cause of action when the issue is confined to the Agency's exercise of discretion in attempting to balance valid, competing values. The Organic Act would serve as a basis for a cause of action were the NPS to allow use of a national park in

Therefore, Count II of Plaintiffs' Complaint must be dismissed.

**D. Count III**

In Count III, Plaintiffs argue that the failure to regulate allocation of use in a fair and equitable manner violates Plaintiffs' Fifth Amendment due process rights. (Compl. ¶36.) Plaintiffs state that they are not suggesting they have a constitutional right to rafting in the River corridor, but that the Defendants' "failure to follow the rules, regulations, and procedures promulgated" by the NPS constitutes a violation of procedural due process. (Reply at 15.) However, "[p]rocedural due process is only available to plaintiffs that establish the existence of a recognized property or liberty interest." *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001). Individuals have no right or interest in having the government conform to "fair" procedures in the abstract. Since Plaintiffs have not pointed to any particular deprivation of life, liberty or property, they have failed to state a claim to procedural due process. *United States v. Buck*, 281 F.3d 1336, 1345 (10th Cir. 2002) (explaining that "no process is required for government actions which do not deprive an individual of one of these three interests").

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Expedited Hearing and Interim Relief is hereby **DENIED**. The Court further finds that the relief requested in Plaintiffs' Complaint for Judicial review will be **DENIED in part and GRANTED in part.** For the

a way that was not in the interests of either conservation or public enjoyment or in a way that was clearly against the interests of future generations.

*Id.*

reasons set forth in this Opinion, Defendants are hereby directed to complete a comprehensive review of the 1989 CRMP; however, all other forms of relief requested by Plaintiff are denied.

Accordingly, this case is hereby dismissed.

Dated this 19th day of April 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiffs:
John Wells
Attorney for Defendants:
Raymond Hamilton
John W. Zavitz

Attorney for Defendant-Intervener:
Susan M. Hapka
Sam Kalen